UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | | |
|---|---|---|---|
| JOHN D. PERRY, | ) | | |
| | ) | | |
| Plaintiff, | ) | | |
| | ) | | |
| v. | ) | No. 1:05CV198 CAS |
| | ) | (FRB) |
| JO ANNE B. BARNHART, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This cause is before the Court on plaintiff's appeal of an adverse ruling of the Social Security Administration. All pretrial matters were referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b) for appropriate disposition.

**I. Procedural History**

On June 6, 2003, plaintiff John D. Perry filed an application for Disability Insurance Benefits pursuant to Title II, 42 U.S.C. §§ 401, et seq., in which he alleged that he became disabled on April 27, 2003. (Tr. 51-53.) On initial considera-tion, the Social Security Administration denied plaintiff's claim for benefits. (Tr. 23.) On September 7, 2004, upon plaintiff's request, a hearing was held before an Administrative Law Judge (ALJ). (Tr. 207-25.) Plaintiff testified and was assisted by a non-legal representative. A vocational expert also testified at

the hearing. On December 7, 2004, the ALJ issued a decision denying plaintiff's claim for benefits. (Tr. 13-22.) On September 2, 2005, after review of additional evidence, the Appeals Council denied plaintiff's request for review of the ALJ's decision. (Tr. 5-8.) The ALJ's determination thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II. Evidence Before the ALJ

A. <u>Plaintiff's Testimony</u>

At the hearing on September 7, 2004, plaintiff testified in response to questions posed by his representative and the ALJ. Plaintiff is forty-eight years of age. (Tr. 210.) Plaintiff completed high school and received a four-year college degree in Marketing Management. Plaintiff also has a vocational-technical degree in Computer Programming which he obtained in 1974. (Tr. 211.)

Plaintiff testified that he last worked in April 2003 with Store Service Group doing "store resets," which plaintiff described as traveling to different stores, such as Lowe's and Home Depot, and tearing down and rebuilding store displays. Plaintiff testified that he worked with Store Service Group for ten years. (Tr. 212.) Plaintiff testified that prior to this employment, he worked for the government for approximately seven or eight years as a meteorologist. Plaintiff testified that he also set up management programs for various companies for a period of time

through 1998, and that he worked several odd jobs in between. (Tr. 213.) Plaintiff testified that he can no longer work because of back pain and instability in the hips. (Tr. 220-21.)

Plaintiff testified that he experiences severe pain in his back and legs when he walks for long distances. Plaintiff testified that he then sits for a while, but must then get up and move around. (Tr. 214.) Plaintiff testified that he has experienced such pain since he quit work and that he has been hospitalized for the condition. Plaintiff testified that his doctor initially could not determine what was wrong, but that he was recently advised that a CT scan showed a problem with his lumbar spine. (Tr. 215.) Plaintiff testified that no surgical solution has been offered for his condition. (Tr. 219.) Plaintiff testified that he takes medication which provides some pain relief if he stays quiet and does not do much. Plaintiff testified that he believes his new medication causes him to become sleepy, and that he can sleep sixteen or seventeen hours a day if he is left alone. (Tr. 216.) Plaintiff also testified that the side effects of his medication legally prevent him from driving inasmuch as he would consider himself to be driving under the influence. (Tr. 215, 218-19.) Plaintiff testified that he lies on a massage/ heating pad at night for his back condition. (Tr. 218.) Plaintiff also testified that his hips give way and that he has recently fallen without warning on account thereof. Plaintiff testified

that he has been told that he has "hip narrowing." (Tr. 221.)

Plaintiff testified that he has recently experienced severe headaches. (Tr. 214, 216.) Plaintiff testified that his physician also recently advised him that he has some numbness and loss of feeling in his feet. (Tr. 220.)

As to his daily activities, plaintiff testified that he wakes in the morning around 9:00 a.m. and watches a laborer work on his house. Plaintiff testified that he takes a nap in the afternoon. Plaintiff testified that he often listens to the television but does not watch it because doing so causes headaches. Plaintiff testified that he performs only a few light household chores such as loading the dishwasher, and that his roommate performs other chores such as laundry and housecleaning. (Tr. 217.) Plaintiff testified that he often goes to church on Sunday mornings. (Tr. 218.) Plaintiff testified that he has engaged in no activities during the previous year since he left his work. Plaintiff testified that he has tried to perform activities such as raking, but that he gets really sore and regrets having tried the activity. (Tr. 216.) Plaintiff testified that he drives two blocks to the grocery store and that he goes to the grocery store twice a week. (Tr. 219.) Plaintiff testified that friends come to his house to visit every couple of weeks. (Tr. 220.)

As to exertional capabilities, plaintiff testified that he is limited in his standing and walking. Plaintiff testified

that he can stand for twenty-five minutes and then experiences a burning pain. (Tr. 218.) Plaintiff testified that he tries to walk a block or two every day, but that he must lie down afterward because of the pain in his back. (Tr. 216.) Plaintiff testified that he experiences hip and back pain when he sits, and that he can sit for thirty to thirty-five minutes before needing to get up and move around for relief. Plaintiff testified that he does not try to lift any weight over twenty pounds. (Tr. 218.) Plaintiff testified that he gets only small bags at the grocery store and that someone is usually at home to unload the groceries. Plaintiff testified that he has trouble bending over and therefore has difficulty tying his shoes. (Tr. 219.)

B.  Testimony of Vocational Expert

Vocational Expert Jeffrey Magrowski testified at the hearing in response to questions posed by the ALJ and plaintiff's representative. Mr. Magrowski characterized plaintiff's past work as a merchandiser as medium and skilled, but heavy as performed by plaintiff; as a regional manager as light and skilled, but medium to heavy as performed by plaintiff; and as a weather observer to be light and skilled. (Tr. 221-22.)

The ALJ asked Mr. Magrowski to assume an individual "in the age range of 35 to 50 years of age, has a high school and college degree and work history as described by the claimant." (Tr. 222.) The ALJ then asked Mr. Magrowski to assume that such an

individual "is limited to essentially sedentary work and lifting a maximum of 20 pounds occasionally, ten pounds frequently. Standing and walking would be limited to two hours in an eight-hour day. Crawling, bending, stooping and kneeling and crouching and climbing would be occasional, limited to occasional." (Tr. 222.) Mr. Magrowski testified that such a person could not perform plaintiff's past relevant work but could perform sedentary, semi-skilled jobs such as customer service representative, of which over 5,000 such jobs exist in the State of Missouri and over 300,000 nationally; office worker, of which over 4,500 such jobs exist in the State of Missouri and over 249,000 nationally; and accounting clerk, of which over 15,000 such jobs exist in the State of Missouri and over 100,000 nationally. (Tr. 222-23.) Mr. Magrowski further testified that if such a person was required to have a sit/stand option during the course of the work day, he could continue to perform these jobs. (Tr. 223.)

Plaintiff's representative then asked Mr. Magrowski to assume an individual who suffers "with lumbar disk disease and multiple joint arthritis and would require two to three hours of sleeping every day or rest breaks due to the chronic pain[.]" (Tr. 224.) Mr. Magrowski responded that such a person would be precluded from performing full time work and maintaining a regular work schedule. The representative then asked Mr. Magrowski to further assume that such a person would, in addition, need to

"withdraw from the work station and would likely be absent more than three times a month due to that time, medical impairment[,]" to which Mr. Magrowski responded that "[l]ong-term he'd probably be fired or terminated." (Tr. 224.)

## III.  Medical Records[1]

Plaintiff visited the emergency room at Southeast Missouri Hospital on September 2, 2002, after falling from a step ladder at home. (Tr. 131-36.) X-rays of the wrists and forearms showed fractures in the right upper extremity. (Tr. 135-36.) On September 3, 2002, plaintiff visited Orthopaedic Associates, Inc., for follow up from his emergency room visit. Plaintiff was provided a cast and sling for his injuries. (Tr. 100-01.) On September 10, 2002, plaintiff was instructed to remain off work for six to eight weeks unless his employer could find work requiring only light duty with no upper extremity use. (Tr. 100.) After a series of follow up examinations (Tr. 96-100), plaintiff was released from medical care on February 7, 2003, and was instructed to participate in activities as tolerated. (Tr. 96.)

---

[1]Additional evidence which was not before the ALJ was submitted to and considered by the Appeals Council. This evidence consists of treatment notes and reports from Dr. R. L. Stahly dated September 15, 2004, through February 9, 2005. (Tr. 200-04.) The Court must consider these records in determining whether the ALJ's decision was supported by substantial evidence. Frankl v. Shalala, 47 F.3d 935, 939 (8th Cir. 1995); Richmond v. Shalala, 23 F.3d 1441, 1444 (8th Cir. 1994). For the sake of continuity, discussion of these records is incorporated with that of the records before the ALJ at the time of his decision.

Plaintiff visited Dr. Michael C. Wulfers at Cape Girardeau Physician Associates on March 31, 2003, and reported that he had recently slipped on some steps and banged his left heel. Plaintiff reported that he began experiencing pain the day after he slipped, but that the pain was currently a little better. Physical examination showed no pain over the left Achilles tendon and no swelling of the left ankle or foot. Minimal tenderness was noted to palpation over the left heel pad. (Tr. 145.) Plaintiff was diagnosed with left heel contusion and was given a heel pad to wear in his left shoe. (Tr. 144.)

Plaintiff was admitted to the emergency room at Southeast Missouri Hospital on April 26, 2003, with complaints of pain in his left leg and groin area, with some numbness in the left foot. (Tr. 119-21.) Plaintiff reported that he had been experiencing the pain for approximately three weeks and that it had recently worsened. Plaintiff also reported that chiropractic adjustment did not relieve the pain. (Tr. 119.) Dr. David R. Meece noted plaintiff's medications to include Lanoxicap[2] and Lorcet.[3] (Tr. 120.) Physical examination showed some tenderness in the lower lumbosacral spine extending to the left gluteal region. The inguinal region also

---

[2]Lanoxicap (Lanoxin) is indicated for the treatment of mild to moderate heart failure and for the control of ventricular response rate in patients with chronic atrial fibrillation. Physicians' Desk Reference 1418-19 (55th ed. 2001).

[3]Lorcet contains narcotic analgesics and acetaminophen to relieve pain. Medline Plus (last revised May 21, 2001)<http://www.nlm.nih.gov/medlineplus/druginfo/uspdi/202392.html>.

showed some tenderness which also involved the left thigh. Pain was elicited with any rotation and flexion of the hip, with radiation of the pain noted to be into the left leg. After administration of Toradol,[4] plaintiff continued to be unable to bear weight on the left leg and had trouble controlling the leg. Dr. Meece questioned whether plaintiff suffered from stroke or deep vein thrombosis and plaintiff was admitted for further evaluation. (Tr. 121.)

A CT scan taken April 26, 2003, of the lumbar spine showed degenerative change involving the right facet at L4-5. Otherwise, the diagnostic test was normal, with a specific note that there was no significant disk protrusion or neural foraminal narrowing. (Tr. 130.) An x-ray of the lumbar spine showed levoscoliosis with facet sclerosis at the L4-5 and L5-S1 levels, with no significant disk space narrowing. (Tr. 129.) An x-ray of the left hip showed increased density, possibly representing a minimal or shallow osteophyte collar. (Tr. 128.) A bone imaging exam showed no acute findings. (Tr. 127.)

Dr. William K. Kapp examined plaintiff on April 30, 2003, and noted plaintiff to experience pain on abduction of the left hip and to exhibit diffuse tenderness across the inguinal region of the hip. Plaintiff experienced no pain in the left leg upon internal

---

[4]Toradol is indicated for the short-term management of moderately severe acute pain that requires analgesia at the opioid level. Physicians' Desk Reference 2789-91 (55th ed. 2001).

and external rotation.  Dr. Kapp noted the etiology of plaintiff's pain to be unknown but opined that it was most likely musculoskeletal.  Dr. Kapp recommended that plaintiff be placed on Medrol[5] dose pack and Neurontin.[6]  (Tr. 116.)

A CT scan of the abdomen performed on May 1, 2003, showed a large parapelvic cyst with no hydronephrosis or obstruction.  A simple cyst in the superior pole of the left kidney was also identified.  (Tr. 125.)  Chest x-rays and a lung scan performed that same date were within normal limits.  (Tr. 123-24.)

Plaintiff was discharged from Southeast Missouri Hospital on May 2, 2003.  (Tr. 112.)  Plaintiff's medications upon discharge included Darvocet,[7] Lanoxicap, Medrol, and Neurontin.  (Tr. 113.)

On May 9, 2003, plaintiff visited Dr. Kapp at Orthopaedic Associates for follow up of his recent hospitalization for inflammation in the left hip.  Dr. Kapp noted plaintiff to have been given Medrol and Neurontin in the hospital, with which plaintiff was noted to have done "quite well."  Plaintiff continued

---

[5]Medrol relieves inflammation (swelling, heat, redness, and pain) and is used to treat certain forms of arthritis, skin and kidney disorders, and severe allergies. Medline Plus (revised Nov. 8, 2004)<http://www.nlm.nih.gov/medlineplus/druginfo/uspdi/202018. html>.

[6]Neurontin is used to manage a condition called *postherpetic neuralgia*, i.e., pain after "shingles." Medline Plus (revised Oct. 3, 2003)<http://www.nlm.nih.gov/medlineplus/druginfo/uspdi/202732. html>.

[7]Darvocet is indicated for the relief of mild to moderate pain.  Physicians' Desk Reference 1708-09 (55th ed. 2001).

to complain of some groin pain but felt like it was slowly improving. Dr. Kapp determined to discontinue Neurontin and provided plaintiff a Medrol dose pack. Plaintiff was instructed to return in two weeks at which time he would be referred to Dr. Burns if his condition showed no improvement. (Tr. 96.)

Plaintiff returned to the emergency room at Southeast Missouri Hospital on May 21, 2003, complaining of severe pain in his left hip radiating to the left groin area. (Tr. 107-09.) Plaintiff reported that upon finishing his steroid pack he began experiencing pain again, and that he currently was unable to move his left hip or walk without experiencing unbearable pain. Physical examination showed no tenderness to the back nor any swelling or redness of the left hip or lower extremities. (Tr. 108.) Plaintiff was given Percocet[8] in the emergency room with very little improvement. (Tr. 108-09.) A CT scan of the left hip showed some degenerative changes with narrowing of the joint space, but no evidence of joint effusion was observed. (Tr. 110.) A CT scan of the lumbar spine showed there to be no neuroforaminal encroachment or spinal stenosis, nor any evidence of focal nerve root impingement. Degenerative facet joint changes on the right at L4-5 were noted. (Tr. 111.) Plaintiff was admitted for observation and was examined by Dr. Jeffrey W. Childers, who noted

---

[8]Percocet is indicated for the relief of moderate to moderately severe pain. Physicians' Desk Reference 1211 (55th ed. 2001).

plaintiff's relevant medical history. (Tr. 105-06.) Physical examination by Dr. Childers showed plaintiff to experience severe left hip pain with external rotation and trace pain with internal rotation. Plaintiff also had significant pain with flexion of the left hip. (Tr. 105.) Dr. Childers diagnosed plaintiff with intractable left hip pain with unknown etiology. It was noted that plaintiff did not have an MRI due to the presence of a pacemaker. Steroid injections to the affected areas were considered. In the meanwhile, it was determined that plaintiff would be given Percocet to control pain. (Tr. 106.) Plaintiff was discharged on May 26, 2003, and was prescribed Disalcid[9] and Lanoxicap upon discharge. Plaintiff had no limitations placed upon him and could engage in activities as tolerated. (Tr. 104.)

On May 28, 2003, plaintiff visited his dentist, Dr. Mark Adams, for complaints of a severe toothache. Dr. Adams prescribed Hydrocodone[10] for pain and Doxycycline, an antibiotic, for swelling and soreness. (Tr. 150.)

During a follow up examination on June 3, 2003, Dr. Wulfers noted that the degenerative changes of the hip observed in

---

[9]Disalcid (Salsalate) is a salicylate which is indicated for relief of the signs and symptoms of rheumatoid arthritis, osteoarthritis and related rheumatic disorders. Physicians' Desk Reference 1800 (55th ed. 2001); Medline Plus (revised Aug. 4, 2005)<http://www.nlm.nih.gov/medlineplus/druginfo/uspdi/202515.html>.

[10]Hydrocodone is marketed under the name of Vicodin, which is indicated for the relief of moderate to moderately severe pain. Physicians' Desk Reference 1629-30 (55th ed. 2001).

the CT scan were not enough to cause plaintiff's severe pain. Plaintiff reported that he is able to walk and get around while taking Disalcid, but that he begins to experience pain "after a few hours up on his hip[.]" (Tr. 144.) Plaintiff reported that he could not return to his work inasmuch as he was a self-employed handyman and performed construction. Dr. Wulfers noted that plaintiff walked with a limp. Physical examination showed no pain over the outer left hip to palpation. Plaintiff's current medications were noted to be Doxycycline, Lanoxicap and Disalcid. (Tr. 144.) Dr. Wulfers diagnosed plaintiff with left hip pain of uncertain etiology and instructed plaintiff to increase his dosage of Disalcid. Dr. Wulfers determined that once plaintiff reached a therapeutic dose of Disalcid, he would try to have plaintiff return to work and then follow up with him thereafter. (Tr. 142.)

On June 12 and 13, 2003, Dr. Wulfers prescribed Neurontin and Disalcid for plaintiff. (Tr. 142.)

Plaintiff returned to Dr. Wulfers on July 7, 2003, who noted plaintiff to continue to complain of significant pain in his left hip and lower back. It was noted that plaintiff had not yet returned to work. Plaintiff reported that Salicylate and Neurontin have helped, but that he continues to have a lot of pain. Plaintiff reported that was considering obtaining disability. (Tr. 141.) Dr. Wulfers diagnosed plaintiff with left hip and lower back pain of uncertain etiology, and questionably minimal degenerative

joint disease of the left hip. Plaintiff was referred to Dr. Patrick Knight for another opinion inasmuch as Dr. Wulfers believed he had done all that could be done for plaintiff's condition. (Tr. 140, 141.) Dr. Wulfers instructed plaintiff to continue with his medications. (Tr. 141.)

Plaintiff underwent a consultative examination on August 6, 2003, for disability determinations. (Tr. 152-56.) Dr. Anthony J. Keele noted plaintiff's chief complaints to be scoliosis, osteoarthritis and heart problems. Plaintiff reported to Dr. Keele that he had been diagnosed with scoliosis two years prior and had some chronic back pain. (Tr. 152.) Plaintiff reported that he takes several medications, including Salsalate and Hydrocodone for pain in his low back. Plaintiff also reported experiencing pain in his legs. Plaintiff reported that his treating physician diagnosed him in April 2003 with osteoarthritis. Plaintiff reported that he has a lot of sepsis in the morning, but that it somewhat improves throughout the day. (Tr. 153.) Dr. Keele noted plaintiff to have very guarded movements with examination of the lower extremities. Range of motion was limited secondary to pain (Tr. 154), but Dr. Keele reported plaintiff to have poor effort with range of motion testing (Tr. 156). Dr. Keele noted plaintiff to be very slow in getting on and off of the examination table. Dr. Keele also noted plaintiff to have a slow gait, which Dr. Keele observed to seem to be exaggerated. (Tr. 154.) Dr. Keele's functional assessment of

plaintiff was as follows:

> This patient has joint pain in his hips,
> knees, and low back. I did not see any
> evidence of acute synovitis, however. The
> patient has a very slow guarded gait. He is
> not using an assisted device. The patient
> walked hunched-over. The patient can sit for
> an hour. He can stand for 10-15 minutes. He
> can walk 2-3 blocks. He can lift 15 pounds.
> He can carry that amount. He has no problems
> handling small objects. His hearing is
> normal. He has no problems speaking or
> traveling.

(Tr. 154.)

In summary, however, Dr. Keele opined that plaintiff's pain appeared to be out of proportion from the findings on the various diagnostic studies that had been performed. "The patient was also quite theatrical today during the examination, in regards to his ability to move, and with his cooperation with range of motion testing." (Tr. 154.) Dr. Keele diagnosed plaintiff with mild levoscoliosis of the lumbar spine and osteoarthritis of the lumbar spine and hips. (Tr. 154.)

In a Physical Residual Functional Capacity Assessment completed August 19, 2003, for Disability Determinations, SSA Counselor Jennifer Dennis opined that plaintiff could occasionally lift and carry twenty pounds, and frequently lift and carry ten pounds. Ms. Dennis further opined that plaintiff could stand and/or walk at least two hours in an eight-hour workday and sit about six hours in an eight-hour workday. Ms. Dennis opined that

plaintiff should only occasionally engage in climbing, balancing, stooping, kneeling, crouching, and crawling. Ms. Dennis opined that plaintiff had no other limitations. (Tr. 157-64.)

On October 20, 2003, plaintiff visited Dr. Robert F. Nagy and reported that he hurt his back while lifting garbage out of a friend's truck. Plaintiff complained that he had severe pain down his legs and that everything was hurting. Plaintiff reported that he could not sleep, even with muscle relaxants and pills. Plaintiff reported his pain to be a level nine on a scale of one to ten, and that he was unable to perform normal duties and daily activities. Dr. Nagy recommended chiropractic therapy, therapeutic exercises and home therapy, and instructed that plaintiff undergo such treatment plan three to four times a week for three to four weeks. Plaintiff returned to Dr. Nagy on October 21 and reported that he experienced severe pain in the low back, between the shoulders and in the neck. Dr. Nagy noted there to be slow improvement and plaintiff was instructed to continue with the treatment as previously recommended. On October 22, Dr. Nagy noted there to be satisfactory improvement and plaintiff reported that he was "maybe some better." On October 23, plaintiff reported that he was doing better, that he was able to move, and that he was sleeping better. Dr. Nagy noted plaintiff's improvement to be good and instructed plaintiff to continue with his treatment plan. (Tr. 190.)

Plaintiff returned to Dr. Nagy on December 12, 2003,[11] and reported that he aggravated and hurt his neck and back when he slipped on a gravel driveway. Physical examination showed positive bilateral cervical compression, positive Kemp's sign with left listing, positive straight leg raising at forty-degrees bilaterally, and positive spinal percussion at C4-T7. Assessments of sensory deficits and reflexes were unremarkable. (Tr. 190.) Dr. Nagy determined to continue plaintiff on the treatment plan as previously prescribed. (Tr. 190-91.) On December 13, plaintiff reported some improvement but that he was still hurting. Dr. Nagy found plaintiff's improvement to be satisfactory and continued plaintiff on the prescribed treatment plan. On December 15, plaintiff reported improvement and that his pain was not as severe as the previous week. Dr. Nagy noted plaintiff's improvement to be good and continued plaintiff on the prescribed treatment plan. (Tr. 191.)

Plaintiff returned to Dr. Nagy on March 10, 2004,[12] and reported that he had fallen from a ladder while painting and currently had severe pain in his neck and between the shoulders

---

[11]As acknowledged by the defendant Commissioner in her brief, a review of the substance of Dr. Nagy's notes shows him to have commenced treatment of plaintiff in October 2003 and to have continued such treatment through July 2004. (Tr. 190-93.) The summary of Dr. Nagy's treatment contained in this Report and Recommendation follows the sequence of his notes, despite the apparent typographical errors within the notes as to the year such treatment was rendered.

[12]See supra note 11.

with some pain in the low back. Plaintiff reported his pain to be at a level eight and that he was unable to perform normal duties and daily activities. Straight leg raising was negative. Spinal percussion was positive at C3-T8. Spurling's test was positive as was Kemp's with left listing. Assessments of sensory deficits were unremarkable. Dr. Nagy determined to place plaintiff on the treatment regimen as previously used. On March 11, plaintiff reported that he continued with the same pain and that pain pills and muscle relaxants did not help. Dr. Nagy noted there to be slow improvement and determined to continue with the same treatment plan. On March 12, plaintiff reported some improvement and that his pain was not as severe. Plaintiff reported his pain to be at a level six. Dr. Nagy noted plaintiff's improvement to be satisfactory and plaintiff was instructed to continue on the same treatment plan. On March 15, plaintiff reported that he was doing better and thanked Dr. Nagy for his services, stating that he otherwise would not be able to "make it" and that it was the "only way he can get back." (Tr. 191.) Dr. Nagy noted plaintiff's improvement to be good and instructed plaintiff to continue in the same treatment plan. (Tr. 192.)

Plaintiff returned to Dr. Nagy on May 2, 2004, and reported that he was hurting and could barely get up and down. Dr. Nagy determined to treat plaintiff as he had on previous occasions. On May 3, plaintiff reported some improvement in his pain and that

he slept a little better.  Plaintiff reported his pain to be at a level eight and that it was moderate but not disabling.  Dr. Nagy continued plaintiff on the same treatment plan.  On May 4, plaintiff reported that he was moving a lot better and sleeping okay.  Dr. Nagy noted there to be good improvement and continued with the same treatment plan.  (Tr. 192.)

On July 26, 2004, plaintiff returned to Dr. Nagy and reported that he was lifting heavy rocks and a wheelbarrow when he twisted and felt his low back go out.  Plaintiff reported pain down his legs and into his arms from his neck.  Plaintiff reported his pain to be at a level nine, very severe, causing him to cry out in pain.  Valsava's test was positive.  Straight leg raising was positive bilaterally at thirty degrees.  Kemp's test was positive with left listing.  Bilateral cervical compression was also positive.  (Tr. 192.)  Dr. Nagy noted that the degenerative joint disease throughout the spine made it easier for injury flare-ups.  Dr. Nagy determined to treat plaintiff as he had for past injuries.  On July 27, plaintiff reported to Dr. Nagy that he felt the same, and plaintiff was continued on the treatment plan as previously ordered.  (Tr. 193.)

Plaintiff visited Dr. Wulfers on July 27, 2004, and complained of worsening pain in the left lower back and hip area, radiating down the buttocks and sometimes down the left leg to the calf.  Plaintiff reported that the symptoms worsen with standing

and particularly with sitting and that he had been taking twenty Extra Strength Tylenol daily. Physical examination showed normal neuromuscular exam of the feet, and straight leg raising was negative bilaterally. Slump test was "probably positive" with elevation of the left leg, causing some pain in the back and some radiation of pain down the left leg. Dr. Wulfers noted plaintiff to have fair range of motion of the back in all directions. Dr. Wulfers opined that plaintiff may have a lumbar disk problem and ordered a CT scan. Dr. Wulfers instructed plaintiff to decrease his use of Tylenol, and Ultram[13] was prescribed. (Tr. 176.)

On July 28, 2004, plaintiff reported to Dr. Nagy that he had improved and could walk again. Plaintiff reported that he continued to have pain but that he could move better. Plaintiff reported his pain to be at a level five, moderate but not disabling. Dr. Nagy noted plaintiff's continued improvement and instructed that plaintiff continue on the same treatment plan. (Tr. 193.)

Plaintiff underwent a CT scan of the lumbar spine on August 3, 2004. The CT scan showed the lumbar vertebrae to be normal in height and alignment with minor degenerative changes in the disks and end plates. The spinal canal did not appear to be stenosed at any level and the neuroforamina did not appear to be

---

[13]Ultram is indicated for the management of moderate to moderately severe pain. Physicians' Desk Reference 2398-99 (55th ed. 2001).

stenosed. The nerve roots did not appear to be compressed. Relative narrowing of the lateral recesses at L4-5 were noted, but such did not appear to be sufficient to constitute stenosis. Relatively severe degenerative changes in the right facet joint were noted, showing prominent vacuum joint phenomenon. (Tr. 166-67.) On August 4, 2004, Dr. Wulfers noted that the CT scan showed severe degenerative joint disease but noted that plaintiff was unable to take non-steroidal anti-inflammatory drugs. Dr. Wulfers questioned whether a pain clinic would be able to help plaintiff's condition. (Tr. 176.)

On August 17, 2004, plaintiff reported to Dr. Wulfers that he had recently developed headaches. Physical examination was unremarkable. Dr. Wulfers diagnosed plaintiff with probable tension headaches. Plaintiff was instructed to take Ultram and Skelaxin[14] for his headaches. On August 23, 2004, additional samples of Skelaxin were given to plaintiff. (Tr. 177.)

On August 25, 2004, Neurologist Randall L. Stahly evaluated plaintiff upon referral from Dr. Wulfers. (Tr. 172-74.) Plaintiff reported to Dr. Stahly that he has become "essentially disabled" because it is painful to walk or use his hands. Dr. Stahly reviewed plaintiff's past relevant medical history and noted plaintiff's hyperalgesia and allodynia – associated with numbness

_____

[14]Skelaxin is indicated as an adjunct to rest, physical therapy and other measures for the relief of discomforts associated with acute, painful musculoskeletal conditions. Physicians' Desk Reference 1080 (55th ed. 2001).

and tingling in the hands and feet – to have been occurring for several months but that plaintiff experienced pain in his low back and tail bone for up to two years. Plaintiff reported that steroids partially resolved these problems but only for four weeks. Plaintiff reported that he failed trials of Celebrex due to rash and that Neurontin caused mood swings and gastrointestinal problems. (Tr. 172.) Plaintiff's current medications were noted to include Skelaxin, Salsalate, Ultram, Lortab,[15] and Lanoxicap. Motor examination was unremarkable. Dr. Stahly noted plaintiff to have significant fade to temperature and pinprick sensation in shoe/stocking distribution, and marked loss of vibratory perception at the toes with preserved position sense. Romberg's test was negative. (Tr. 173.) Neurovascular exam was negative. (Tr. 174.) Dr. Stahly noted plaintiff's gait to be hobbling in nature due to foot pain. (Tr. 173.) Dr. Stahly scheduled plaintiff for a polyneuropathy work up. (Tr. 174.) Upon this initial examination, Dr. Stahly opined that plaintiff had evolving sensory polyneuropathy with arthralgias. (Tr. 172.)

A nerve conduction study of the lower extremities performed September 1, 2004, showed mild distortion of the compound muscle action potendistal peroneal nerves bilaterally with mildly decreased nerve velocities of the left posterior tibial nerve. An electromyographic examination performed that same date was

_____

[15]Lortab is indicated for the relief of moderate to moderately severe pain. <u>Physicians' Desk Reference</u> 3209-10 (55th ed. 2001).

unremarkable.  (Tr. 179.)

Plaintiff visited Dr. Stahly on September 15, 2004, who noted plaintiff's medications to be Lanoxicap, Skelaxin, Salsalate, Lortab, Ultram, Amitriptyline,[16] and Trileptal.[17]  Plaintiff was given samples of Trileptal.  (Tr. 201.)

On September 15, 2004, Dr. Stahly reported to Dr. Wulfers the results of various diagnostic tests, and specifically, that a CFS examination was essentially negative; that a polyneuropathy work up was unremarkable; that EMG/nerve conduction study demonstrated a very mild sensorimotor polyneuropathy; that an MRI of the low back demonstrated some mild lateral foraminal stenosis and a mild disc bulge which was most likely unrelated to plaintiff's scattered complaints.  Dr. Stahly noted that plaintiff seemed to be resting better with Trileptal and that Amitriptyline was prescribed for headaches.  Dr. Stahly stated that he could not explain plaintiff's migratory arthalgias, chronic complaints of hand and foot pain, or his headaches.  (Tr. 204.)  On that same date, Dr. Stahly referred plaintiff to Dr. Arjad Roumany for evaluation regarding possible underlying collagen vascular disease or some other inflammatory or rheumatoid-type illness (Tr. 203),

---

[16]Amitriptyline is indicated for the relief of symptoms of depression, Physicians' Desk Reference 626 (55th ed. 2001), but is also sometimes used to treat chronic pain or certain skin disorders, Medline Plus (last revised Apr. 1, 2005)<http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682388.html>.

[17]Trileptal is an anti-seizure medication.  Physicians' Desk Reference 2223-24 (55th ed. 2001).

and an appointment was made with Dr. Roumany for October 6, 2004 (Tr. 201.)

On September 21, 2004, Dr. Stahly completed a questionnaire regarding plaintiff's ability to perform work-related activities. (Tr. 169-71.) Dr. Stahly opined that, due to plaintiff's ongoing arthralgias, plaintiff could occasionally lift and carry ten pounds, and could frequently lift and carry the same amount. Dr. Stahly opined that plaintiff could stand and walk less than two hours in an eight-hour workday, and specifically, that plaintiff must change positions every five minutes while standing and could not walk at all during an eight-hour workday. (Tr. 169-70.) Dr. Stahly also opined that plaintiff had no limit in his ability to sit during an eight-hour workday, but that he must change positions every fifteen minutes while sitting. (Tr. 169.) Dr. Stahly opined that plaintiff needs to shift at will from standing, walking or sitting and that, one or two times a week, plaintiff must lie down at unpredictable intervals. Dr. Stahly opined that plaintiff could only occasionally twist, stoop, crouch, and climb. (Tr. 170.) Dr. Stahly reported that pain in plaintiff's hands affected plaintiff's ability to reach, handle, finger, feel, push, and pull. Dr. Stahly also reported that plaintiff should avoid all exposure to extreme cold, heat and wetness, as well as to fumes, odors, dusts, gases, and poor ventilation. Dr. Stahly opined that plaintiff should avoid even

moderate exposure to humidity, noise, and hazards such as machinery and heights. Dr. Stahly stated that plaintiff's impairments would cause him to be absent from work more than three times a month, noting specifically that plaintiff was "off work and essentially disabled due to hand, foot [and] joint pain." (Tr. 171.)

On November 1, 2004, plaintiff followed up with Dr. Stahly who noted plaintiff's medications to be Lanoxicap, Skelaxin, Salsalate, Amitriptyline, Hydrocodone, and Trileptal. Dr. Stahly noted plaintiff to have an appointment scheduled for January 31, 2005. (Tr. 201.) On that same date, Dr. Stahly reported to Dr. Wulfers that plaintiff continued to complain of daily headaches, myalgias and foot pain. Dr. Stahly reported that diagnostic studies were negative and that Dr. Roumany reported that a rheumatological evaluation was unremarkable. Physical examination showed a diminished vibratory perception at the toes with preserved reflexes and normal strength. Mild fade to temperature and pinprick sensation in a stocking distribution was noted. Dr. Stahly instructed plaintiff to increase his Amitriptyline and to continue with Trileptal. Dr. Stahly also noted plaintiff to continue to complain of daytime sleepiness and that an Epworth Sleep Scale was abnormal with a score of 14. Dr. Stahly noted plaintiff to be scheduled for a polysomnogram. (Tr. 202.)

On January 19, 2005, plaintiff called Dr. Stahly and requested a refill of Toradol. (Tr. 200.)

On Monday, January 31, 2005, plaintiff visited Dr. Stahly for a three-month check up. Plaintiff reported having had a headache since the previous Friday. Dr. Stahly instructed plaintiff to increase his Trileptal and Amitriptyline. (Tr. 200.)

On February 9, 2005, plaintiff telephoned Dr. Stahly and reported that he continued to have headaches. Zyprexa[18] was prescribed. (Tr. 200.)

### IV. The ALJ's Decision

The ALJ found that plaintiff had not engaged in substantial gainful activity since April 27, 2003. The ALJ found plaintiff's degenerative disc disease of the lumbar vertebrae to be a severe impairment, but that such impairment did not meet or medically equal an impairment listed in Appendix 1, Subpart P, Regulations No. 4. (Tr. 21.) The ALJ also found plaintiff's allegations regarding his limitations not to be credible. The ALJ found plaintiff to have the residual functional capacity to lift ten pounds frequently and twenty pounds occasionally, to stand or walk for two hours in an eight-hour workday, and to sit six hours in an eight-hour workday. The ALJ found plaintiff to be limited to occasional climbing, balancing, stooping, kneeling, crouching, and crawling. The ALJ found plaintiff unable to perform his past relevant work. Considering plaintiff's age, education and work

---

[18]Zyprexa is indicated for the manifestations of psychotic disorders. Physicians' Desk Reference 1788-89 (55th ed. 2001).

history, the ALJ used Medical-Vocational Rules 201.21 and 201.22 as a framework and determined plaintiff able to perform a significant number of sedentary, unskilled jobs in the national economy, and specifically, customer service representative, office worker and accounting clerk.  The ALJ therefore determined plaintiff not to be disabled at any time prior to the date of the decision.  (Tr. 22.)

## V.  Discussion

To be eligible for Social Security Disability Insurance Benefits under the Social Security Act, plaintiff must prove that he is disabled.  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Secretary of Health & Human Servs., 955 F.2d 552, 555 (8th Cir. 1992).  The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

To determine whether a claimant is disabled, the

Commissioner engages in a five-step evaluation process.  See 20 C.F.R. § 404.1520; Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity.  If the claimant is working, disability benefits are denied.  Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits his ability to do basic work activities.  If the claimant's impairment(s) is not severe, then he is not disabled.  The Commissioner then determines whether claimant's impairment(s) meets or is equal to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1.  If claimant's impairment(s) is equivalent to one of the listed impairments, he is conclusively disabled.  At the fourth step, the Commissioner establishes whether the claimant can perform his past relevant work.  If so, the claimant is not disabled.  Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002).  Substantial evidence is less than a preponderance but enough that a reasonable

person would find it adequate to support the conclusion. <u>Johnson v. Apfel</u>, 240 F.3d 1145, 1147 (8th Cir. 2001).

To determine whether the Commissioner's decision is supported by substantial evidence, the Court must review the entire administrative record and consider:

1. The credibility findings made by the ALJ.

2. The plaintiff's vocational factors.

3. The medical evidence from treating and consulting physicians.

4. The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5. Any corroboration by third parties of the plaintiff's impairments.

6. The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

<u>Stewart v. Secretary of Health & Human Servs.</u>, 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting <u>Cruse v. Bowen</u>, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The Court must also consider any evidence which fairly detracts from the Commissioner's decision. <u>Warburton v. Apfel</u>, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence. <u>Pearsall</u>, 274 F.3d at 1217 (citing <u>Young v. Apfel</u>, 221 F.3d 1065, 1068(8th Cir. 2000)). A Commissioner's decision may not be reversed merely

because substantial evidence also exists that would support a contrary outcome. <u>Jones ex rel. Morris v. Barnhart</u>, 315 F.3d 974, 977 (8th Cir. 2003).

Plaintiff claims that the ALJ's decision is not supported by substantial evidence on the record as a whole and, specifically, that the ALJ erred in his determination regarding the severity of plaintiff's impairments. Plaintiff specifically argues that the ALJ erred in failing to find that his impairment of degenerative disc disease met Listing 1.04, Disorders of the Spine; and in finding that his impairment of degenerative joint disease of the hip was not severe. Plaintiff argues that had the ALJ properly considered plaintiff's subjective complaints and the objective medical evidence of record, he would have found plaintiff's impairments to be of listing level severity. Plaintiff further contends that the ALJ failed to fully and fairly develop the record by failing to obtain medical notes and discharge summaries from plaintiff's hospitalizations and by failing to obtain the report of an MRI to which Dr. Stahly referred in his September 2004 letter to Dr. Wulfers. For the following reasons, plaintiff's claims must fail.

A.    <u>Severity of Impairments</u>

1.    *Listing 1.04 – Disorders of the Spine*

Plaintiff first complains that the ALJ erred in finding plaintiff's degenerative disc disease not to meet the criteria of

Listing 1.04, Disorders of the Spine.

Listing 1.04 sets out the criteria which must be met for a claimant's musculoskeletal spinal impairment to be disabling *per se*:

> 1.04 *Disorders of the spine* (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equine) or the spinal cord. With:
>
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or
>
> B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or
>
> C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

Listing of Impairments at 20 C.F.R. Part 404, Appendix 1, Subpart P.

For a claimant to demonstrate that his impairments meet or equal a listed impairment, he must prove that he "meet[s] *all* of the

specified medical criteria. An impairment that manifests only some of [the] criteria, no matter how severely, does not qualify." Sullivan v. Zebley, 493 U.S. 521, 530 (1990) (emphasis in original); see also Naegele v. Barnhart 433 F. Supp. 2d 319, 323-24 (W.D.N.Y. 2006) ("It must be remembered that plaintiff has the burden of proof at step 3 that [he] meets the Listing requirements.").

Plaintiff contends that a review of the record as a whole, including his recorded signs and symptoms, shows his diagnosed conditions of degenerative disc disease and spinal stenosis to meet Listing 1.04. The ALJ, however, found that while the record showed plaintiff to have degenerative disc disease, there was no evidence of stenosis or compromise of the spinal cord such that the severity of plaintiff's impairment, or its duration, met the criteria of the Listing. (Tr. 17.) For the following reasons, the ALJ's determination is supported by substantial evidence on the record as a whole.

The ALJ found that plaintiff had a severe impairment of degenerative disc disease of the lumbar spine. To be *per se* disabling under Listing 1.04, however, such condition must compromise a nerve root or spinal cord which, under 1.04(A), must be shown by

> Evidence of nerve root compression
> characterized by neuro-anatomic distribution
> of pain, limitation of motion of the spine,

> motor loss (atrophy with associated muscle
> weakness or muscle weakness) accompanied by
> sensory or reflex loss and, if there is
> involvement of the lower back, positive
> straight-leg raising test (sitting and
> supine)[.]

Here, plaintiff does not meet or equal Listing 1.04(A) because the record reveals no evidence of nerve root compression. Between April 2003 and August 2004, three CT scans were taken of plaintiff's lumbar spine with no evidence of nerve root compression noted. Indeed, a specific note was made in May 2003 that the CT scan showed no evidence of focal nerve root impingement, and again in August 2004 that the CT scan showed the nerve root not to appear compressed. While plaintiff may have exhibited some symptoms, such as pain, limitation of motion of the spine, and positive straight-leg raising, a review of the record as a whole shows such symptoms to have been intermittent in nature. (See, e.g., Tr. 190 – Dec. 2003, straight-leg raising positive; Tr. 194 – March 2004, straight-leg raising negative; Tr. 192 – July 26, 2004, straight-leg raising positive; Tr. 176 – July 27, 2004, straight-leg raising negative.) In addition, there is no evidence that plaintiff suffered any atrophy with associated muscle weakness or muscle weakness. Because there is no objective medical evidence of record demonstrating nerve root compression, and because plaintiff has failed to show that he meets all of the criteria of Listing 1.04(A), the ALJ did not err in his determination that plaintiff

did not meet this Listing. See Zebley, 493 U.S. at 530.

Likewise, substantial evidence on the record as a whole supports the finding that plaintiff did not meet Listing 1.04(C).[19] All of the objective medical evidence shows plaintiff not to have lumbar spinal stenosis. To the extent plaintiff claims that Dr. Stahly refers to an MRI which shows such stenosis, the undersigned notes that Dr. Stahly observed such stenosis to be mild. (Tr. 204.) Nevertheless, to meet Listing 1.04(C), plaintiff must demonstrate that his lumbar spine stenosis results in an "inability to ambulate effectively," as defined in 20 C.F.R. Part 404, Appendix 1, Subpart P, § 1.00(B)(2)(b), which, as set out below, plaintiff fails to do.

Under § 1.00(B)(2)(b), the "inability to ambulate effectively" means

> an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. . . .
>
> [] *To ambulate effectively,* individuals must be capable of sustaining a reasonable walking

_____

[19]Plaintiff does not claim, nor does the evidence show, that plaintiff's impairment of degenerative disc disease arguably meets the criteria of Listing 1.04(B) – spinal arachnoiditis. As such, Listing 1.04(B) is not discussed here.

pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transporta- tion, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R. Part 404, Appendix 1, Subpart P, § 1.00(B)(2)(b)(1), (2).

There is substantial evidence on the record that shows that, although plaintiff is mildly limited in distance and duration for walking, he is not so limited as to meet the definition of "an inability to ambulate effectively." First, there is no evidence in the record that plaintiff ever used, was instructed to use, or was prescribed an assistive device for ambulating. Further, at the administrative hearing in September 2004, plaintiff testified that he walks a block or two every day and that he experiences pain when he walks for "long distances." (Tr. 214, 218.) Plaintiff testified that he drives and goes grocery shopping twice a week. (Tr. 219.) In addition, the medical record shows that plaintiff reported to Dr. Wulfers in June 2003 that, with his medication, he is able to walk and begins to experience pain after "a few hours up

on his hip." (Tr. 144.) Plaintiff reported to Dr. Keele in August 2003 that he is able to walk two to three blocks. (Tr. 154.) Finally, as noted by the ALJ, plaintiff's reports to Dr. Nagy throughout the remainder of 2003 and in 2004 showed him to engage in a relatively normal and active lifestyle which included activities such as unloading garbage from a truck, painting while on a ladder, lifting heavy rocks, and using a wheelbarrow. Such activities are not indicative of a person unable to ambulate effectively. While Dr. Stahly opined in September 2004 that plaintiff could not walk at all during an eight-hour workday (Tr. 170), the ALJ properly discounted this statement (Tr. 20). See Holstrom v. Massanari, 270 F.3d 715, 720-21 (8th Cir. 2001) (ALJ properly discounted treating physician's opinion when based on short-term relationship with claimant); Woolf v. Shalala, 3 F.3d 1210, 1213-14 (8th Cir. 1993) (physician's opinion may be discounted when based only on subjective complaints and there is no testing to support opinion); Turpin v. Bowen, 813 F.2d 165, 170-71 (8th Cir. 1987) (treating physician's opinion may be discounted if unsupported by the evidence); Ward v. Heckler, 786 F.2d 844, 846 (8th Cir. 1986) (per curiam) (physician's opinion must be supported by medically acceptable clinical or diagnostic data). Nevertheless, given the substantial evidence in the record that plaintiff can ambulate effectively, Dr. Stahly's unsupported statement is insufficient evidence in and of itself that

plaintiff's impairment meets Listing 1.04(C). <u>Naegele</u>, 433 F. Supp. 2d at 323-24.

Therefore, for all of the foregoing reasons, the ALJ's finding that plaintiff's degenerative disc disease did not meet the criteria for Listing 1.04 is supported by substantial evidence on the record as a whole and should not be disturbed.

2. *Listing 1.02 – Major Dysfunction of a Joint (Hip)*

Plaintiff contends that the ALJ erred in finding plaintiff's degenerative joint disease of the left hip not to be severe, and argues that such condition in fact meets the listing level severity of Listing 1.02 – Major Dysfunction of a Joint.

A disabling impairment is an impairment which is so severe that it meets or equals a set of criteria in the Listing of Impairments or which, when considered with the claimant's age, education and work experience would result in a finding that the claimant is disabled. 20 C.F.R. § 404.1511(a). The impairment

> must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and labora- tory diagnostic techniques. A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [the claimant's] statement of symptoms[.]

20 C.F.R. § 404.1508.

"To qualify as severe, an impairment must 'significantly limit [a claimant's] physical or mental ability to do basic work

activities,' . . . which are 'the abilities and aptitudes necessary to do most jobs.'" <u>Gwathney v. Chater</u>, 104 F.3d 1043, 1045 (8th Cir. 1997) (quoting 20 C.F.R. § 404.1521(a), (b)).

> The ability to do most work activities encompasses the abilities and aptitudes necessary to do most jobs. . . . Examples include physical functions such as walking, sitting, standing, lifting, pushing, pulling, reaching, carrying, or handling; capacities for seeing, hearing, and speaking; under-standing, carrying out and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work situation.

<u>Nguyen v. Chater</u>, 75 F.3d 429, 431 n.1 (8th Cir. 1996) (quotation marks and citations omitted).

Where an impairment has no more than a minimal effect on a claimant's ability to do work, the ALJ may find the claimant's impairment not to be severe, and thus end his analysis at the second step of the sequential evaluation process. <u>Id.</u> at 431.

In his opinion, the ALJ found plaintiff's degenerative joint disease of the left hip not to be a severe impairment inasmuch as the objective medical evidence of record failed to demonstrate that plaintiff's pain condition was caused thereby:

> The claimant was hospitalized twice in 2003 due to complaints of severe pain in his left hip. In April 2003, a consulting physician noted that the results of a hip x-ray and bone scan were unremarkable. His treating physician, Michael Wulfers, M.D., noted in June 2003 that although a CT scan showed

> minimal DJD, "it did not seem to be enough to
> explain his severe pain."  I do not find DJD
> in the claimant's left hip to be a medically
> determinable severe impairment.

(Tr. 17.)  (Internal citations to record omitted.)

Substantial evidence on the record as a whole supports this determination that plaintiff's hip condition was not severe.

Plaintiff complained of and was treated for left hip pain from April 2003 through July 2003.  While a CT scan taken in May 2003 showed some degenerative changes in the left hip, Dr. Wulfers found such changes not be enough to cause the pain experienced by plaintiff, and further determined that any degenerative joint disease of the hip was minimal.  Thereafter, and through January 2005, plaintiff visited four physicians on no less than thirteen occasions and complained of hip pain during this period only to Dr. Wulfers on July 27, 2004, after recently lifting heavy rocks and using a wheelbarrow.  As such, while the May 2003 CT scan showed degenerative joint disease of the hip, substantial evidence on the record as a whole supports the ALJ's determination that such condition was not severe inasmuch as plaintiff was not significantly limited in his ability to do basic work activities on account thereof.  In light of this finding, the ALJ did not err in failing to find that plaintiff's non-severe hip condition met Listing 1.02.

As set out above, substantial evidence supports the ALJ's

decision that plaintiff's hip condition in and of itself was not severe. In accordance with 20 C.F.R. § 404.1523, however, the ALJ nevertheless properly considered this non-severe condition in combination with plaintiff's other impairments in determining plaintiff not to be disabled. See Hajek v. Shalala, 30 F.3d 89, 92 (8th Cir. 1994); see also Barnes v. Social Sec. Admin., 171 F.3d 1181, 1183 (8th Cir. 1999) (per curiam). The ALJ's analysis regarding plaintiff's degenerative joint disease of the left hip was thus proper and should not be disturbed.

B.  Credibility Determination

In his brief, plaintiff appears to contend that the ALJ failed to adequately consider his subjective complaints of pain, arguing that such subjective complaints support a finding that his impairments are of listing level severity.

In determining a claimant's subjective complaints of pain, the ALJ must consider all evidence relating to the claimant's subjective complaints, including the claimant's prior work record and third party observations as to:  1) the claimant's daily activities; 2) the duration, frequency and intensity of the claimant's pain; 3) precipitating and aggravating factors; 4) the dosage, effectiveness and side effects of medication; and 5) claimant's functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted). Although the ALJ may not discount subjective complaints on the sole basis of

personal observation, he may disbelieve a claimant's complaints if there are inconsistencies in the evidence as a whole.  Id.

When, on judicial review, a plaintiff contends that the ALJ failed to properly consider his subjective complaints, "the duty of the court is to ascertain whether the ALJ considered all of the evidence relevant to the plaintiff's complaints . . . under the Polaski standards and whether the evidence so contradicts the plaintiff's subjective complaints that the ALJ could discount his or her testimony as not credible." Masterson v. Barnhart, 363 F.3d 731, 738-39 (8th Cir. 2004).  It is not enough that the record merely contain inconsistencies.  Instead, the ALJ must specifically demonstrate in his decision that he considered all of the evidence. Id. at 738; see also Cline v. Sullivan, 939 F.2d 560, 565 (8th Cir. 1991).  Where an ALJ explicitly considers the Polaski factors but then discredits a claimant's complaints for good reason, the decision should be upheld.  Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001).  The determination of a claimant's credibility is for the Commissioner, and not the Court, to make.  Tellez v. Barnhart, 403 F.3d 953, 957 (8th Cir. 2005); Pearsall, 274 F.3d at 1218.

In this cause, the ALJ did not specifically invoke Polaski by name but nevertheless identified the relevant factors to be considered when assessing plaintiff's credibility.  (Tr. 18.) The ALJ then set out numerous inconsistencies in the record to support his conclusion that plaintiff's complaints were not

credible. Specifically, the ALJ noted that results of x-rays, diagnostic tests and other objective examinations failed to support the degree of pain plaintiff claimed was caused by his musculoskeletal condition; and that Dr. Wulfers, plaintiff's treating physician, recognized such inconsistency. See Gonzales v. Barnhart, 465 F.3d 890, 895 (8th Cir. 2006) (ALJ may make adverse credibility determination in light of contrary objective medical evidence); Curran-Kicksey v. Barnhart, 315 F.3d 964, 968 (8th Cir. 2003) (lack of supporting objective medical evidence may be considered as a factor in evaluating credibility of complaints). The ALJ also noted that plaintiff sought only sporadic treatment from October 2003 through July 2004 and that such treatment was in relation to isolated, injuring events. See Ostronski v. Chater, 94 F.3d 414, 419 (8th Cir. 1996) (failure to seek regular medical treatment and infrequent medical treatment suggests that severity of symptoms not so great to preclude work). In addition, the ALJ noted that plaintiff's activities were inconsistent with his complaints of disabling musculoskeletal pain, specifically noting, inter alia, plaintiff's daily activities of shopping, doing laundry and running errands; as well as plaintiff's reports to Dr. Nagy that he had engaged in activities such as unloading garbage from a truck, painting while on a ladder, lifting heavy rocks, and using a wheelbarrow. See Haggard v. Apfel, 175 F.3d 591 (8th Cir. 1999) (daily activities of cooking, watering flowers around house,

helping spouse paint, watching television, occasional driving, and occasional visiting with friends inconsistent with claim of disabling pain); Spradling v. Chater, 126 F.3d 1072, 1075 (8th Cir. 1997) (daily activities, including hunting, fishing, cooking, cleaning, driving, and visiting friends inconsistent with complaints of intense, continuous pain); Haynes v. Shalala, 26 F.3d 812, 815 (8th Cir. 1994) (caring for livestock, doing laundry, cooking, shopping, and lifting up to fifty pounds inconsistent with complaints of disabling pain). The ALJ also found that plaintiff's self-reports of his capabilities were inconsistent, noting specifically that in his June 6, 2003, application for benefits plaintiff reported that he could not stand more than five or ten minutes; but that in his June 28, 2003, questionnaire, he indicated he could stand for twenty or thirty minutes. Indeed, plaintiff reported to Dr. Wulfers on June 3, 2003, that he could be up for a few hours before experiencing pain; and Dr. Keele noted in August 2003 that plaintiff was "quite theatrical" with pain that appeared "out of proportion" to the medical findings. A claimant's exaggeration of symptoms may be considered in determining his credibility, as well as a physician's opinion that the claimant's reports of pain are inconsistent with his physical condition. Gonzales, 465 F.3d at 895; Baker v. Barnhart, 457 F.3d 882, 893-94 (8th Cir. 2006). Finally, the ALJ noted that plaintiff had been treated with painkillers and chiropractic therapy, and that such

therapy appeared to improve plaintiff's condition.  See Qualls v. Apfel, 158 F.3d 425, 427 (8th Cir. 1998) (impairment not disabling if controlled by medication and treatment); Stout v. Shalala, 988 F.2d 853, 855 (8th Cir. 1993) (same).

A review of the ALJ's decision shows that, in a manner consistent with and as required by Polaski, the ALJ considered plaintiff's subjective complaints on the basis of the entire record before him and set out numerous inconsistencies detracting from plaintiff's credibility.  The ALJ may disbelieve subjective complaints where there are inconsistencies on the record as a whole.  Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990). Because the ALJ's determination not to credit plaintiff's subjective complaints is supported by good reasons and substantial evidence, this Court must defer to the ALJ's credibility determination.  Vester v. Barnhart, 416 F.3d 886, 889 (8th Cir. 2005); Gulliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005).

C.  Developing the Record

Finally, plaintiff contends that the ALJ failed to fully and fairly develop the record as to plaintiff's impairments. Plaintiff argues that the "only question" regarding his impairments of degenerative disc disease of the spine and degenerative joint disease of the hip is that of severity, and that "physician and nurses notes and the discharge summaries from Mr. Perry's April and May, 2003 hospital admissions . . . might shed some light on the

etiology of Mr. Perry's complaints." (Pltf.'s Brief at 11, 12.) Plaintiff also remarks that the MRI report to which Dr. Stahly refers in his September 2004 letter to Dr. Wulfers is absent from the record, and "wonder[s] whether an MRI exam was even performed." (Id. at 12.)

The ALJ has a duty to develop the facts fairly and fully, particularly where the claimant is unrepresented by counsel.[20] Driggins v. Harris, 657 F.2d 187, 188 (8th Cir. 1981). "There is no bright line test for determining when the [Commissioner] has . . . failed to develop the record. The determination in each case must be made on a case by case basis." Battles v. Shalala, 36 F.3d 43, 45 (8th Cir. 1994) (internal quotation marks and citations omitted). "'Unfairness or prejudice resulting from an incomplete record -- whether because of lack of counsel or lack of diligence on the ALJ's part -- requires a remand.'" Id. at 45 n.2 (quoting Highfill v. Bowen, 832 F.2d 112, 115 (8th Cir. 1987)). The relevant inquiry, however, is whether the claimant was prejudiced or treated unfairly by how the ALJ did or did not develop the record. Onstad v. Shalala, 999 F.2d 1232, 1234 (8th Cir. 1993). "[A]bsent unfairness or prejudice, we will not remand." Id.; see also Shannon v. Chater, 54 F.3d 484, 488 (8th Cir. 1995).

To the extent plaintiff claims that the ALJ failed to

---

[20]Plaintiff was not represented by legal counsel during his hearing before the ALJ nor with his request for Appeals Council review. Legal counsel represents plaintiff in the instant cause of action before this Court.

develop the record by failing to seek notes and discharge summaries from plaintiff's hospitalizations in April and May 2003, the record shows that medical evidence from these hospitalizations was indeed sought and obtained by the Social Security Administration. (Tr. 102-36.) Although plaintiff contends that the nurses notes and discharge summaries may "shed some light" on the etiology of plaintiff's complaints, the undersigned notes that during both hospitalizations and upon follow up with his primary physician subsequent to his hospitalizations, a minimum of three medical doctors reported that the etiology of plaintiff's complaints was unknown. (See Tr. 116, 106, 142.) Other than speculation that this additional evidence *might* shed some light on the etiology of plaintiff's complaints, plaintiff has presented no evidence or argument, either to the Appeals Council or to this Court, demonstrating that the source of his pain was indeed determined during his hospitalizations, nor did plaintiff proffer any such medical evidence to either tribunal. See Weber v. Barnhart, 348 F.3d 723, 725-26 (8th Cir. 2003) (addressing claim that ALJ failed to obtain certain medical reports, Eighth Circuit noted that the claimant "certainly could have obtained these records during the appellate process and demonstrated that they were such that a remand to the ALJ was necessary."); see also 20 C.F.R. §§ 404.1512(a), (c); 404.1514 (claimant bears burden of furnishing Commissioner with specific medical evidence showing existence of an

impairment and its severity during the time he claims he is disabled). In the absence of such evidence or proffer, plaintiff cannot show that the additional medical reports, if any, would have added to the medical records already in evidence and before the ALJ at the time of his decision. See Weber, 348 F.3d at 725. Without such a showing, plaintiff cannot demonstrate that he was prejudiced by the ALJ's failure to obtain and consider any additional records. See Shannon, 54 F.3d at 488. Further, the medical evidence of record, which included physician reports during and immediately subsequent to plaintiff's hospitalizations, provided a sufficient basis upon which the ALJ could issue his decision in this cause. As such, it was permissible for the ALJ to render his decision without obtaining additional evidence. See Haley v. Massanari, 258 F.3d 742, 749-50 (8th Cir. 2001); 20 C.F.R. § 404.1516 (in the event claimant fails to submit medical evidence, Commissioner will make determination based on the information available in the case).

To the extent plaintiff appears to complain that the ALJ failed to obtain an MRI report to which Dr. Stahly referred in September 2004, the undersigned notes that plaintiff, himself, questions "whether an MRI exam was even performed." An ALJ cannot be faulted for failing to obtain specific medical evidence which does not exist. See Weber, 348 F.3d at 725-26; 20 C.F.R. § 404.1512(a), (c); 20 C.F.R. § 404.1514. Nevertheless, assuming arguendo that such an MRI examination had been performed in

addition to the CT scans of record, the ALJ had before him Dr. Stahly's opinion that the conditions shown therein were "mild" and were most likely "unrelated" to plaintiff's scattered complaints. Because the ALJ had sufficient information before him upon which he could render a decision as to plaintiff's impairments, it was permissible for the ALJ to render his decision without obtaining such additional evidence. <u>Haley</u>, 258 F.3d at 749-50; 20 C.F.R. § 404.1516.

Accordingly, given the substantial evidence on the record upon which a decision could be rendered in this cause, the ALJ did not err in rendering such a decision without first obtaining nurses notes and discharge summaries from plaintiff's hospitalizations in April and May 2003 and/or the report of an MRI examination which may or may not have occurred.

## VI.  Conclusion

For the reasons set out above on the claims raised by plaintiff on this appeal, the ALJ's determination is supported by substantial evidence on the record as a whole and plaintiff's claims of error should be denied.  Where substantial evidence supports the Commissioner's decision, the decision may not be reversed merely because substantial evidence may support a different outcome, or because another court could have decided the case differently.  <u>Neal ex rel. Walker v. Barnhart</u>, 405 F.3d 685, 688 (8th Cir. 2005); <u>Gowell v. Apfel</u>, 242 F.3d 793, 796 (8th Cir.

2001).  Because there is substantial evidence on the record as a whole to support the ALJ's decision, the Commissioner's determination that plaintiff is not disabled should be affirmed.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be affirmed and that plaintiff's Complaint be dismissed with prejudice.

The parties are advised that any written objections to this Report and Recommendation shall be filed not later than **February 5, 2007.**  Failure to timely file objections may result in waiver of the right to appeal questions of fact.  <u>Thompson v. Nix</u>, 897 F.2d 356, 357 (8th Cir. 1990).

_Frederick R. Buckles_

UNITED STATES MAGISTRATE JUDGE

Dated this _23rd_ day of January, 2007.